Our fifth case for today is Robert Williams v. Wexford Health Sources, Inc. This is a case for the District Court on behalf of plaintiff appellant Robert Williams. In this prisoner suit challenging Wexford's One Good Eye policy, the District Court held that Mr. Williams stated a colorable claim for violation of his constitutional rights. The District Court, nonetheless, granted summary judgment in Wexford's favor based on an erroneous finding that he failed to exhaust his administrative remedies. Counsel, let me ask you about Ross v. Blake. So Ross v. Blake, which post-states Thornton, says that a prisoner has to exhaust if a remedy is available to him. And here, why was the standard grievance procedure not available to the defendant, I mean to the plaintiff? So, Your Honor, Ross was subsequent to this court's decision in Thornton. It was, however, decided before this court's decisions in Cobian, in Kyle's, and in Bentz v. Gosch, where this court determined the standard procedures were not available. And I think the reason for that is that the PLRA, which includes this standard about available, informs us that exhaustion is mandatory. But the PLRA directs us to look to state law, and in this case, the Illinois Administrative Code, to determine what procedures a prisoner actually has to follow. And what the Illinois Administrative Code requires here is that a prisoner complete and submit a grievance form, which is precisely what Mr. Williams did. It didn't include any requirement that he do anything beyond that. And so, in the relevant sense, further procedures were not available to him and did not prevent him from adequately exhausting his remedies in this case. Ms. Hartz, I want to ask you about waiver. I read Wexford's argument below as being, the prison told Williams to file a grievance through the regular channels, and he did not. Is that a completely different argument than the one Wexford is making on appeal? Or is it a variant in the sense that Wexford is now arguing Williams should have listened to the prison official's instructions? So, I think the argument is slightly different for this reason. I think in the district court, Wexford was relying upon instructions that Mr. Williams received from the warden. And here, they claim that the dispositive difference and the basis to distinguish Thornton v. Snyder and five unanimous decisions of this court applying and interpreting Thornton v. Snyder is not the instructions of the warden, but instead the instructions of the Administrative Review Board. So, I do think that that is a very different argument, although, of course, we're not relying upon waiver alone. We're instead relying upon two lines of precedential authority from this court. We have Thornton v. Snyder, which is the definitive and controlling interpretation of the pre-amendment version of the code, which tells us there's no requirement to resubmit. And then we also have a line of precedent that has been brought together with that. But those are all unpublished decisions, so they're not binding. And Thornton doesn't squarely, I mean, it has some dicta that's helpful to Mr. Williams, but it doesn't squarely resolve this issue. Well, of course, the district court was relying only on district court and unpublished decisions, too, non-presidential orders. That's right. The district court relied on Bents v. Ghost, which actually, under certain rules, we're not allowed to consider because it was a pre-2007 unpublished decision. But although some of these decisions were unpublished, I'd say two things. First of all, I think it was a critical threshold issue in Thornton, whether, in fact, the prisoner had to resubmit. That was the issue right at the beginning of the opinion, and if that had gone the other way, then the analysis would have been completely different. As to this court's five decisions that interpret and apply Thornton, those are unpublished decisions. However, they are unanimous decisions, and between them, nine members of this court have articulated the interpretation of the Illinois Administrative Code that Mr. Williams is relying upon here. Counsel, there is a split between the Third and Fifth Circuits on the question of when an emergency grievance goes unanswered, whether the prisoner has to employ the standard grievance procedure. Those cases are even more complex, right, or a little bit harder, because unlike in this case, where Mr. Williams was told, no, no emergency, use the standard, in those cases, the prisoner has heard nothing. In light of that, and in light of that split, you know, for us to say that when he was told to use the standard grievance procedure, he wasn't just, you know, there was not just crickets on the other side, doesn't that seem kind of a tough position for us to take? I don't think so, Your Honor, because I think that this court's decisions are very clear that if the requirement does not exist in the text of the code itself, which it didn't at this time, and to be clear, it has been amended and does now, so the court's decision here would have little, if any, perspective importance, but when that requirement is not in the code itself, then prison officials, whether they're the warden or the board, cannot issue instructions that require the prisoner to do more than is required. And I would just say that this court's faithfulness to its decision in Thornton and to its unpublished decisions on at least five occasions wouldn't add anything to the law on the books, and they certainly wouldn't open the floodgate to prisoner litigation because, as I mentioned, we're talking about the interpretation of the Illinois Administrative Code that was eliminated and replaced three years ago. Well, I haven't looked at Wisconsin and Indiana's, but it's possible that if we accept your argument, it's possible that it would have effect, you know, for other prisoner suits from other states. So I'm not aware of any other grievance procedures within this circuit that would be impacted by a ruling in this case faithful to this court's prior decisions, nor have any been cited by Wexford, so I don't think that it would create any sort of perspective issue. So balancing that against what Wexford is asking this court to do, which is to overrule or at least severely limit its prior precedential decision in Thornton, to break from three unpublished decisions of this case, of this court, excuse me, and to do so at a time after the fact, when Mr. Williams, years ago, reasonably relied upon this court's decisions at the time and believed that the steps that he was taking would fully exhaust his administrative remedies and make it possible for him to pursue a serious constitutional claim in court. I'd also just like to briefly address the sole basis that Wexford provides to distinguish all of this court's prior decisions, to distinguish, for example, Judge Eve's decision on a prior suit by Mr. Williams, my client, to distinguish, for example, Judge McDade's earlier decision on Walker v. Mahone. The only basis that they offer is the fact that the instructions here came from the board and not from the warden. However, those were the facts of the case in Kyles v. Williams, where this court held that there was proper exhaustion, and even beyond that, if you set aside Kyles, Wexford hasn't offered any principled reason why it should make a difference if the instructions came from the warden, excuse me, from the board, as opposed to the warden. If there are no further questions, I'd like to reserve the balance of my time. Thank you. All right. Thank you. Mr. Wimmer.  Your Honor, at the heart of this matter is a disagreement over how the purposes of the Prison Litigation Reform Act square with the requirements under the Illinois Administrative Code grievance process. So I had a similar thought, but maybe from a somewhat different angle than the one that you were briefing. Critical to these exhaustion regimes is transparency for the prisoner. The prisoner is required to exhaust. We all understand that. It can be a very salutary process. But the prisoner needs to know what the rules are. The prisons can't be changing the rules every five minutes and then put the prisoner in a gotcha kind of position. Oh, well, we added this requirement. We added that requirement. We subtracted something else. And so I think there is a strong policy reason for adhering strictly to the written requirements of the grievance procedures, I'll say, whether it's the emergency procedure, whether it's the regular procedure, and allowing the prisoner to rely on that instead of having a regime under which a few little explicit instructions are given in this case, not just about how to process this case, but to move the person to an entirely different pathway. And so that's my concern from a policy point of view with the Department's position that these little one-off instructions can override what is otherwise a clear grievance procedure. So, to address that concern, Your Honor, Mr. Williams' counsel in their reply brief stated and today that there's nothing in the code that allows the Administrative Review Board to request additional information or forces Mr. Williams to send that information. Well, to push him into an entirely different path. I think that's a different thing from saying, can they ask for additional information. Right. They're saying you shouldn't be on this emergency path at all. You should be going through the counselor to the grievance person to the warden to the board. Well, I will point out that, so the warden form that the warden filled out that had a checkbox that said, grievance denied, please resubmit through the normal processes. The Administrative Review Board form that they sent back to Mr. Williams stated, it didn't actually state that the grievance was denied, what it specifically states is, grievance is being returned to the prisoner for the following reasons. More information is necessary, and then it requests two documents from the person. The regular information if you'd gone through the regular process. Your Honor is correct that the documents that they're requesting would require him to go back to his counselor and the grievance officer to obtain those documents. But why isn't the remedy for the problem that you're facing in this case exactly what Illinois did three years ago? It realized that this was unclear, how the emergency procedure interfaced with the regular procedure, it amended the code, this problem will never come up again, we're like over and done with, this is like a one-off case, and going forward, Illinois has now structured in a way so the prisoners all know when they file that first emergency grievance, and maybe Mr. Williams thought that being blind was an emergency, you know, it was not the craziest thing I've ever seen, but if you've chosen the wrong thing, the road map is now clear thanks to the amendments to the regulations, but it wasn't clear before. So what I would argue is that the regulations don't need to be amended in this case because as I was saying in response to their... Well, they've been amended, we're looking at the 2016 version. Right, but it doesn't, what I'm saying is it doesn't need to be amended further in regards to... So you just did a superfluous amendment in 2017? No, I think that that amendment accomplished something, and what it accomplished was it will prevent further cases where inmates have filed a grievance as an emergency in order to get around the administration process. Well, or they just thought it was an emergency and the warden evaluated it in a different way. I think Mr. Williams is a perfect case of that. He's losing his vision. You know, for all he knows, time is of the essence, you know, for medical intervention to salvage some of it. So as I say, I can imagine frivolous cases, but I'm not sure this is one of them. What I don't think that the 2017 amendment solved, and what concerns us in this case, is that if the court rules that direct instructions or requests for more information from the Administrative Review Board do not have to be responded to by the inmates, then an inmate could draft a extremely vague or limited information grievance in order to get... So is that what you're hanging your hat on here, the fact that he was instructed to use the standard grievance procedure? Like, would your position be different if he had not been given that instruction and he was faced with nothing but the text of the regulations? I'm not sure I understand your question. Is it your position that if he had never received an answer saying, sorry, this isn't an emergency, please file your grievance through the standard process, you would say, okay, well, then he did exhaust? I would say if the Administrative Review Board came back and just said, grievance denied, then that would have been an exhaustion, correct. That would have been an exhaustion. That would have been an exhaustion. Really? I think that it would have been an exhaustion. It seems to me that your argument is that the Administrative Review Board can simply create any additional steps that it wants for exhaustion and hold those out as additional remedies for the inmate to exhaust before he can file suit. And, I mean, you know, like what if the Administrative Review Board says, we're denying your appeal, but you may seek relief through your congressperson and ask him to alter the conditions of your confinement, and if they're unable after 12 months to do so, you may file suit. I mean, let's take it to its most odd limit. But that's where your argument, to me, seems to go. I don't think we're making that broad of an argument, Your Honor. What I think we are arguing is that the Administrative Review Board should have the ability to request more information about a prisoner's grievance, and I think that under the code they do have that. In Section 504.850C, it states that they're allowed to hold hearings and that they're also allowed to review documents at their discretion. And so what documents is a little bit vague, and so this court has provided some malleability in the code when it is not extremely specific. And if I can give the court one example, in Cannon v. Washington, in that case an inmate filed an untimely grievance, in this case directly to the Administrative Review Board, under the procedures that allowed him to do that. And the Administrative Review Board returned the grievance saying, you know what, this was untimely, but if you can provide us with more information about why it was untimely, we may consider it. But that's different from what happened here. It is, but, Your Honor, what happened after that is the inmate then, instead of following the Administrative Review Board's direct instructions, sent that description directly to the director. And so even though he tried to follow the guidelines, he didn't follow the specific instructions from the Administrative Review Board. Those instructions are not encapsulated in the code. It doesn't say where the prisoner has to send that additional information. And so the court found in that case, because he didn't follow the specific instructions. But your case is different. I mean, because this was adding, if you're right, I guess I'm kind of surprised. So I just want to clarify, because this is important to me. You are saying that you would not be raising the exhaustion defense if, notwithstanding Ross v. Blake, notwithstanding the availability language, if he filed an emergency grievance which was denied and the standard grievance process remained available to him, which you just said to me before was that you would consider then it was exhausted and he could just come to court. So let me clarify. We made the argument in our brief that after the warden, the chief administrative officer, denied his grievance as non-emergent, that he still should have had to go back and file that grievance. But you told me a few minutes ago that this was turning on the fact that the warden gave him additional. No, you definitely said that. You repeated that. Because I was pretty surprised that you said that. Not the warden. Sorry, whoever. The ARB. The Administrative Review Board. Right. Yes. So I think that the law would show that if he went through the process with the Administrative Review Board and they denied his grievance on the merits of his grievance, if they reviewed it, and said because an emergency grievance usually can't be reviewed by the Administrative Review Board. So they can't determine a procedural issue like that. The code only allows them to determine issues on the merits. And so if they determine an issue on the merits, which is what they were attempting to do by getting more information from the prisoner. You keep saying that, but I guess that's your explanation with Judge Barrett. But the thing that's troublesome to me is that they aren't just asking for more information. They are spelling out the other path for grievances. And until the amendment in the code, that wasn't an obligation on a prisoner. It may have been a gap, but it's non-transparent to prisoners that they have to do that. They might double file if they know they have to do that. Your Honor, I see my time has expired. Yeah, please. No, feel free to answer. So, Your Honor, I think that the code is clear that they have to file these grievances, and I don't think that it's going to expand the authority of the Administrative Review Board to be able to ask for information about grievances in order to properly handle those grievances. Okay. Thank you, Your Honor. Thank you very much. Anything further, Ms. Hartz? Yes, Your Honor. I'd like to make three quick points. First of all, I think what you just heard from my friend was a concession that, in fact, the standard procedures were not available based on the pre-amendment version of the code. And that's, in fact, consistent with a statement in their brief saying that what was available to Mr. Williams after he received the instructions from the warden was to appeal, not to go back to the standard procedure. So I think that's significant. I also want to briefly address what it is that the ARB did in this case, what its instructions meant, and on that, Chief Judge Wood, I think you're exactly right. The ARB wasn't simply asking for additional information to be able to process the grievance, and I think one reason you know that— Do you think it was entitled to do that, if that's what it had been doing? Yes, and I think there is a clear basis for that in the code. However, if you look at the District Court Docket Entry 31, Exhibit B, where you see the return of grievance form, there is, in fact, a separate checkbox that the ARB would have used if it was simply looking for additional information about what the grievance meant. It did not use that checkbox. It instead used the checkboxes requesting a response from the counselor, the grievance officer, and the chief administrative officer, which would only exist if, in fact, Mr. Williams went back through the full informal process. I think the final point I'd like to make is in response to this argument that we should use the generalized purpose of the Prison Litigation Reform Act to somehow override what it is that the Illinois Administrative Code actually said at the time. The Supreme Court has rejected that mode of analysis in Jones v. Bok, where, in fact, the issue was whether you could use the purpose of the PLRA for the interpretation of the PLRA. What Wexford is suggesting is something even more extreme, which is that you would override the text of a state statute based on a broad purpose, and that is not permitted. What's important, as you pointed out, Chief Judge Wood, is transparency and clarity. This is perhaps the last case under the old rule, but this Court's prior decisions properly address the outcome in this case, and they should be adhered to here. So we would ask that you reverse the judgment of the district court. All right. Well, thank you very much, and we appreciate you and your firm accepting this appointment. It's of great use to the Court. Thanks. And thanks as well, of course, to Mr. Wimmer. We will take the case under advisement.